UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No:  2:13-cr-60-FtM-29UAM

DONAL DORVILUS

_____

**REPORT AND RECOMMENDATION**

**TO THE UNITED STATES DISTRICT COURT**

  **I.**     **Introduction**

        This cause is before the Court on Defendant Donal Dorvilus' ("Defendant") Motion to

Suppress Identification Evidence ("Motion to Suppress") (Doc. 25) filed on July 23, 2013.  The

Government filed a Response to Defendant's Motion to Suppress Identification Evidence (Doc.

27) on August 5, 2013.  Defendant is charged with Possession of a Firearm by a Convicted

Felon, in violation of 18 U.S.C. §§ 922(g)(1), and Brandishing and Carrying a Firearm in

Furtherance of a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  This matter

was referred to the Court for a report and recommendation and an evidentiary hearing was held

on August 7, 2013.  For the reasons explained below, the Court respectfully recommends that

Defendant's Motion to Suppress be **DENIED**.

  **II.**    **Evidence**

        The Government presented the testimony of two witnesses, Detective Jose Gomez and

Detective Myra King, both of the Fort Myers Police Department.  The Government introduced

eight exhibits into evidence: Exhibit 1, the photographic lineup shown to Lawrence Amorosi on

December 20, 2012; Exhibit 2, the photographic lineup shown to Daniel Paselk on December

20, 2012; Exhibit 3, the photographic lineup shown to Lawrence Amorosi on December 20, 2013; Exhibit 4, the photographic lineup shown to Daniel Paselk on February 15, 2013; Exhibit 5, a compact disc containing an audio recording of Lawrence Amorosi's viewing of the January 12, 2013 lineup; Exhibit 5a, the transcript of Exhibit 5; Exhibit 6, a compact disc containing an audio recording of Daniel Paselk's viewing of the February 15, 2013 line-up; Exhibit 6a, the transcript of Exhibit 6.   Defendant introduced five exhibits into evidence: Exhibit A, a still image from a surveillance video; Exhibit E, a jail photo of Defendant from January 18, 2013; Exhibit F, a pamphlet entitled "Eye Witness Evidence: A Guide for Law Enforcement" published by the U.S. Department of Justice; and Exhibit G, a compact disc containing eyewitness evidence studies; Exhibit H, Fort Myers Police Department General Order 20.5 entitled "Eyewitness Identification: Line-Ups & Show-Ups".[1]

### A.  Testimony of Detective Jose Gomez

Detective Gomez testified that he began his employment with the Fort Myers Police Department in 2006 and has served as an investigator since 2011. (Tr.[2] 7).  On December 20, 2012, Detective Gomez and Detective Myra King received a call that a robbery had just occurred at 3120 Winkler Avenue in Fort Myers, Florida.[3]  (Tr. 7-8).  After arriving at the scene of the crime, Detective Gomez conducted an interview with the victim, Lawrence Amorosi. (Tr. 8).  Detective Gomez testified that Mr. Amorosi explained that he was negotiating the sale of a motor scooter with a man later identified as Carl Watts and another man when the other man jumped over a desk, retrieved money and a gun from the desk drawer, pointed it at Mr.

---

[1]   Defendant did not introduce Exhibits B, C, and D because they were duplicative of exhibits already introduced by the Government.

[2]   "Tr." refers to an uncertified draft transcript of the evidentiary hearing held before the Court on August 7, 2013.

[3]   Defendant's Motion to Suppress provides that a business called *Motorsports* is located at this address. (Doc. 25 p. 1).

Amorosi, and then ran out, got on a motor scooter, and left the scene. (Tr. 8-9).   Detective

Gomez testified that Mr. Amorosi told him that he had ample opportunity to view the person

who committed the robbery because the negotiations occurred in Mr. Amorosi's office and

lasted upwards of three minutes. (Tr. 9).   Mr. Amorosi described the robber as a black male

between five feet six inches tall to five feet eleven inches tall. (Tr. 9).   Mr. Amorosi further

described the robber as being stocky, not having any facial hair, and as having a hair style in

which the robber's dreadlocks pointed outwards. (Tr. 9).   Nothing was covering the suspect's

face. (Tr. 9).

Detective Gomez testified that after interviewing Mr. Amorosi, he returned to the police

department and began creating a lineup. (Tr. 10).   Detective Gomez searched the police

database for associates of Mr. Watts that fit the description given by Mr. Amorosi. (Tr. 10).

Detective Gomez testified that he came up with the name of an individual whose name he could

not remember while testifying. (Tr. 10).   Detective Gomez created a lineup in which the

individual that he found from his computer search of the police database was the suspect. (Tr.

10-11).   Detective Gomez testified that he created this lineup in black and white. (Tr. 11).

Detective Gomez explained that he created the lineup in black and white so as to deemphasize

such things as skin tone and the color of clothing. (Tr. 11).   After finishing the lineup,

Detective Gomez showed the lineup individually to a few secretaries that work in the police

department and to everyone in the crime scene unit and asked them if anyone stood out. (Tr.

12).   Detective Gomez testified that the people who viewed the lineup told him that no one

stood out. (Tr. 12).   Detective Gomez printed out two copies of the lineup and then returned to

the scene of the crime. (Tr. 12).

Detective Gomez testified that he read the first page of the lineup verbatim to Mr. Amorosi before showing him the lineup. (Tr. 13). Detective Gomez testified that the first page of the lineup is a standard form containing instructions that are to be read by the investigator before showing a witness a lineup. (Tr. 13). The front page instructs witnesses as to what they should be looking for and instructs witnesses not to look at hairstyles or facial features because such features change. (Tr. 13). Detective Gomez testified that the instructions encourage witnesses not to feel forced to pick anyone in particular and, if the person that committed the crime is not in the lineup, then not to pick anyone at all. (Tr. 13). After reading the instructions to Mr. Amorosi, Detective Gomez had Mr. Amorosi initial the form demonstrating that he understood the instruction. (Tr. 13). Detective Gomez then showed the lineup to Mr. Amorosi and gave him ample time to view it. (Tr. 13). Mr. Amorosi was unable to identify anyone in the lineup. (Tr. 13).

On cross examination, Detective Gomez testified that he was also present when a second lineup was shown to Mr. Amorosi on January 12, 2013, and when a second lineup was shown to another witness, David Paselk on February 15, 2013. (Tr. 14-15). Detective Gomez testified that he was not present when Mr. Paselk was shown the lineup created on December 20, 2012, but that Detective King had shown Mr. Paselk this lineup at the scene of the crime. (Tr. 16). Detective Gomez testified that the first lineup contained a subject who was a known associate of Mr. Watts and that he could not recall the initial subject's name or identify him from the December 20, 2012 lineup. (Tr. 17).

Detective Gomez testified that there was surveillance video of the individual believed to have committed the robbery, but that it was impossible to make an identification of the suspect from the video. (Tr. 19). Detective Gomez testified that the video surveillance is clear enough

to make out that the suspect has a hairstyle which comes into several sharp points. (Tr. 19). Detective Gomez testified that Mr. Amorosi described the robber as having a medium to stocky build, and that Mr. Amorosi did not give a weight description, describe any tattoos or facial tattoos, and also stated that he was not sure if the individual had facial hair because he kept leaning away. (Tr. 21).

Detective Gomez testified that at the time of the incident that he had been an investigator for approximately a year and a half and that he was the senior detective involved in the investigation. (Tr. 22).

Detective Gomez testified that the lineups shown to Mr. Amorosi and Mr. Paselk on the later occasions were the same. (Tr. 23).  Detective Gomez testified that Defendant was present in these later, second lineup and that Defendant was added to the lineup based on a tip given to Detective King. (Tr. 24).  Detective Gomez testified that he did not participate in the creation of the later lineups and did not know who the suspect was when he was first shown the lineup. (Tr. 24).  However, by the time the second lineup was shown to Mr. Amorosi and Mr. Paselk, Detective Gomez knew that Defendant was the subject of the lineup. (Tr. 26-27).

Detective Gomez testified that he was familiar with the term independent administrator, which is somebody that shows a lineup to a witness, but who does not know the subject of the lineup. (Tr. 27).  Detective Gomez testified that an independent administrator did not show the lineups to the witnesses in this case because the detectives did not have the manpower to do so. (Tr. 27).

### B.  Testimony of Detective Myra King

Detective King testified that she has worked for the Fort Myers Police Department for approximately six years and that she has been a detective since September 2012. (Tr. 32-33).

Detective King testified that on December 20, 2012, she and Detective Gomez received a call that a robbery was in progress and arrived on the scene and made contact with the witnesses. (Tr. 33).  Detective King spoke with Mr. Paselk. (Tr. 33).  Detective King testified that Mr. Paselk was at the location to purchase a scooter for his wife. (Tr. 34).  Two black males came up inquiring about a scooter. (Tr. 34).  Detective King testified that Mr. Paselk stated that one male was taller than the other. (Tr. 34).  Mr. Paselk related that after the taller individual went into the store to inquire about purchasing a scooter, Mr. Paselk had a cordial conversation with the shorter male suspect. (Tr. 34).  Mr. Paselk said that the shorter individual then went into the scooter shop. (Tr. 34).  Mr. Paselk stated that after the shorter individual went into the store, Mr. Paselk's back was turned and that he did not see anything until the shorter male came out, hopped on a scooter and drove off. (Tr. 34).  Detective King testified that Mr. Paselk related that he got a good look at both individuals because he had a conversation with the two individuals and neither of their faces were covered. (Tr. 34).

Detective King testified that Mr. Paselk described the shorter individual as being a dark skinned male, between five feet six inches to five feet nine inches, and that his hair was sticking up. (Tr. 35).  Mr. Paselk also said that the individual had a shoulder to shoulder tattoo but could not describe the design. (Tr. 35).

Detective King testified that she remained on scene when Detective Gomez returned to the police station to create a lineup. (Tr. 36).  After Detective Gomez returned from the station with the lineup he created, Detective King showed the lineup to Mr. Paselk. (Tr. 36).  Detective King testified that she put Mr. Paselk under oath and read the instructions on the first page of the lineup. (Tr. 37).

Detective King testified that Mr. Paselk commented that he was not a hundred percent sure at the time he was viewing the lineup and that he did not want to wrongfully incriminate anyone. (Tr. 38).  Mr. Paselk said that he was focusing on the lips of the individual and that the individual had fuller lips than the people in the lineup. (Tr. 38).  Mr. Paselk was unable to make a positive identification at that time. (Tr. 38).

Detective King testified that after showing the lineup to Mr. Paselk she did not show it to anyone else. (Tr. 39).   Detective King testified that she did not show the lineup to a mechanic at the shop because he stated that the occurrence happened so fast that he did not get a look at the robber. (Tr. 39).  Mr. Watts, the individual that accompanied the suspect into the store, originally stated that he would give an identification, but later, after Detective Gomez returned to the scene with the lineup, stated that he would be unable to do so because he did not want to make a mistake. (Tr. 39).

Detective King testified that she gave still images of the surveillance video showing the suspect to a public relations officer who released the photos to the press. (Tr. 39).  Detective King testified that in January 2013 she received a call from a patrol officer relating that he had received an anonymous tip about someone seeing the surveillance video pictures on the news and who was able to identify the suspect. (Tr. 40).  The anonymous tip identified the suspect in the surveillance video image as Defendant. (Tr. 40).   The only information Detective King received from the tip was the name of the Defendant. (Tr. 40).   Detective King looked up Defendant's name in LCSO internet and DAVID,[4] the driver's license database, and found a recent photograph of Defendant that was in the system. (Tr. 41).  Detective King took the photograph and created a lineup with Defendant as the lineup's subject. (Tr. 41).  Detective

---

[4] The Court notes that it is unsure that these acronyms are accurate.

King testified that she used photographs of individuals with similar descriptions, facial features, complexions, and hairstyles as fillers in the lineup. (Tr. 41).  Detective King got the filler photographs from the mug shot database. (Tr. 41).  Detective King testified that she showed the lineup to Detective Gomez, who did not know who the subject of the lineup was, to see if anything stood out to him. (Tr. 42).  The second lineup was in black and white to deemphasize variables such as clothing color. (Tr. 42).

Detective King testified that she showed this second lineup to Mr. Amorosi in January 2013. (Tr. 43).  Detective King testified that she put Mr. Amorosi under oath and read over the standard language instructions on the front of the lineup. (Tr. 43).  Detective King testified that Mr. Amorosi made a positive identification based not only on the suspect's hairstyle and but also the suspect's facial features. (Tr. 44).

Detective King further testified that she showed this second lineup to Mr. Paselk in February 2013. (Tr. 46).     Detective King testified that she put Mr. Paselk under oath, read over the lineup instructions, and then showed him the lineup. (Tr. 46).  Mr. Paselk made a positive identification of Defendant. (Tr. 47).

On cross examination, Detective King testified that she had only been working as a detective for about three months and that Detective Gomez was slightly more experienced than her. (Tr. 48).  Detective King testified that no other witnesses besides Mr. Amorosi and Mr. Paselk were shown any lineups. (Tr. 49).  Detective King's memory was refreshed and she testified that Mr. Paselk originally described the suspect as weighing approximately 200 to 210 pounds and was between five feet six inches and five feet seven inches. (Tr. 50).  Detective King testified that Defendant, who was present at the hearing, looked to her to be approximately 190 pounds. (Tr. 51).  Detective King testified that Defendant was listed as

weighing 150 pounds when he was arrested in January 2013. (Tr. 51).  Detective King further testified that Defendant looked as if he could be five feet six inches or five feet seven inches tall. (Tr. 52).

After having her recollection refreshed, Detective King testified that Mr. Paselk described the suspect as wearing a black shirt with a logo. (Tr. 52).  Detective King testified that the suspect in the surveillance video was wearing a tan, beige, or brown colored shirt, and that Mr. Paselk was inaccurate as to his description of the suspect's clothing. (Tr. 53).

Detective King testified that the individuals in the filler photographs in the second lineup had similar hairstyles to the hairstyle described by the witnesses. (Tr. 57-60).  Detective King testified that the individuals in the second lineup photograph numbers 1, 2 and 3 did not have the feature of chubby cheeks, but that the individuals in photograph numbers 4 and 6 did. (Tr. 65).  Detective King testified that the closeness of the photograph is a variable that she could control in creating the lineup. (Tr. 66).

Detective King testified that there are numbers beneath the photographs in the second lineup. (Tr. 67).  Detective King testified that the number corresponding to Defendant's photograph has a nine digit number while the numbers corresponding to the other photographs have six digit numbers. (Tr. 68).  Detective King testified that she did not consider blanking out this information when showing the second lineup to the witnesses. (Tr. 68).

Detective King testified that she used the most recent photograph of Defendant in constructing the lineup. (Tr. 68).  Detective King testified that after she showed Mr. Amorosi the second lineup on January 12, 2013, but before she showed the second lineup to Mr. Paselk on February 15, 2013, that Defendant was arrested and his mug shot was taken. (Tr. 69). Detective King testified that she did not create a lineup with the newer photograph, but showed

Mr. Paselk the same lineup that she showed Mr. Amorosi on January 12, 2013. (Tr. 70). Detective King testified that Fort Myers Police Department General Order 20.5 provides that suspects should be placed in a different position in each lineup, both across cases and with multiple witnesses in the same case. (Tr. 72).  Detective King testified she did not do this in this case. (Tr. 72).

Detective King testified that the only reason Defendant was a suspect was due to an anonymous tip which was communicated to her via Officer Walter Mickey. (Tr. 72).  Detective King testified that Officer Mickey received the tip after the media published the still image from the surveillance video. (Tr. 73).  Detective King testified that she did not ask Mr. Amorosi or Mr. Paselk whether they had seen the video surveillance image before showing them the second lineup. (Tr. 73).

Detective King testified that she was unfamiliar with the terms blind lineup and double blind lineup. (Tr. 75).  Detective King testified that she was familiar with the term independent administrator. (Tr. 76).  Detective King testified that it is appropriate that nothing be said during a lineup showing that could influence a witness' decision. (Tr. 77).  Detective King testified that it is important to obtain some indication of a witness' certainty at the time the witness makes his identification and that comments by the person showing the lineup may increase the witness' level of certainty. (Tr. 77).

At the hearing, Defendant's attorney questioned Detective King as to when Mr. Amorosi and Mr. Paselk circled the Defendant's photograph on the second lineup. (Tr. 80-83). Detective King testified that Mr. Paselk identified Defendant as the suspect through a process of elimination and that Mr. Paselk was certain that Defendant was the suspect. (Tr. 82, 83).

Detective King testified that there is no policy against using sequential lineups and that she was only trained using simultaneous lineups. (Tr. 87).

### C. The Second Lineup Showing to Mr. Amorosi

On January 12, 2013, Detective Gomez and Detective King showed Mr. Amorosi the second lineup created by Detective King as described above. (Exhibit 5). Present at the showing were Detective Gomez, Detective King, Mr. Amorosi, and Craig Amorosi, Mr. Amorosi's son. (Exhibit 5a p. 1). After Mr. Amorosi was put under oath and a preliminary inquiry regarding Mr. Amorosi's personal information was performed, the following exchange occurred:

| | |
|---|---|
| Detective King: | Before we get into that, I'm gonna read this off to you. You'll be asked to view a group of photos of individuals, it is just as important to clear innocent persons from suspicions as to identify guilty parties. The person of interest may or may not include, be included in the photo array, and the photos that are in, in, that are in any particular order. I don't know whether the person that's being in, investigated is in this group. Individuals presented in the photos may not appear exactly as they did on the day of the incident, because of features such as hairstyle and facial hair are subject to cha, change, and complexion may look slightly different in photos. You should not feel that you have to make an identification. If you identify, someone, I'll have you designate the photograph of the person you have identified. Regardless of whether you make identification or not, we will continue to investigate any incident. The photos will be shown to you simultaneously, are not in any particular order. Take as much time as you need to examine the photos. This is a, since this is an ongoing investigation you should not discuss the identification procedures or results. Okay, the photo array I'm gonna show you is consisted of six photos. You understand? Do me a favor and initial right there. Those are the photos. |
| Mr. Amorosi: | Man I'm real heavy on this guy here. That'd be my second choice… |
| Detective Gomez: | That's, that's…. |
| Mr. Amorosi: | ….but I know I don't have a second choice. |

- 11 -

Detective Gomez:       ….thats the person you think it is, just circle, and.

Detective King:        Yeah.

Detective Gomez:       That's the person (unintelligible) just circle the picture (unintelligible).

Mr. Amorosi:          I circle this?

Detective Gomez:       If that's the person you think it is.

Mr. Amorosi:          Yeah. (unintelligible).

Detective King:        And just make sure you initial that (unintelligible).

Mr. Amorosi:          That looks really good.

Detective Gomez:       Okay.

Detective King:        Okay.

Detective Gomez:       (unintelligible).

Detective King:        Now um….

Mr. Amorosi:          And I ain't even going by…

Detective King:        ….selected.

Mr. Amorosi:          …his hair, I'm going by the round face.

Detective King:        Okay.

Mr. Amorosi:          I'm going by the lips.

Detective King:        And that's um, right here, you selected photo number five? As the person?

Mr. Amorosi:          Yeah.

Detective King:        Okay. Sign here for me.

Mr. Amorosi:          I figured you wanted him so bad, we were joking, I don't want to take it the wrong way.  I said they're gonna put, they're gonna put five white guys, one black guy…

- 12 -

| | |
|---|---|
| Detective Gomez: | (laughs). |
| Mr. Amorosi: | ….(unintelligible) the black guy? |
| Detective King: | Nooo. |
| Detective Gomez: | No, we wouldn't do something like that. |

(Exhibit 5a p. 2-3).

**D.  The Second Lineup Showing to Mr. Paselk**

On February 15, 2013, Detective Myra King and Detective Jose Gomez showed Mr. Paselk the second lineup created by Detective King. (Exhibit 6).  After Mr. Paselk was put under oath and a preliminary investigation as to Mr. Paselk's personal information was performed, the following exchange occurred:

| | |
|---|---|
| Detective King: | Alright I'm going to read off the instruction.  You will be asked to view a group of photos of individuals.  It's just as important to clear innocent persons from suspicion as to identify guilty parties. The person of interest may or may not be included on the photo array.  Individuals presented in the photos may not appear exactly as they did on the day of the incident . . . because the features such as hair style and facial hair are subject to change.  And complexion may look slightly different in photographs.  You should not feel you have to make an identification.  If you do identify someone, I will have you initial next to or on top of the other photograph indicating the person that you have identified. Regardless of rather you make an identification we will continue this investigation.  The photos shown . . .will be simultaneously and are not in any particular order.  Take as much time as you need to examine the photos.  Since this is an ongoing investigation you should not discuss the identication procedures or results. Do you understand? |
| Mr. Paselk: | I understand. |
| Detective King: | Alright.  Initial here for me please.  The photo array that's shown will be . . . six photos. |
| Mr. Paselk: | Okay. I think its gotten a lot easier. |
| Detective King: | Initial. |

| Mr. Paselk: | It's not him.  Not him. (unintelligible).  Not him. Not him. It's him. |
| Detective King: | I need you to initial that um…by the photo. |
| Detective Gomez: | Circle the picture. |
| Detective King: | Circle and write your initial. |
| Mr. Paselk: | I got to think about that and make sure.  I don't want to make mistakes.  It's not him, it's not him, it's not him…yeah…it's got… |
| Detective Gomez: | That's the guy you're feeling… |
| Mr. Paselk: | Yeah I don't want to talk myself out of this. |
| Detective Gomez: | No that's the guy you're feeling, go ahead. |
| Mr. Paselk: | But I… |
| Detective Gomez: | Like we said just uh…just look at the face…if that's the person you feel it is…circle, initial and date it and that's it. |

(Exhibit 6a p. 2-3).

## III.   Analysis

Defendant argues that the photographic lineups[5] shown to Mr. Amorosi and Mr. Paselk were unduly suggestive, not sufficiently reliable, and will lead to a substantial likelihood of misidentification. (Doc. 25 p. 2).  Defendant contends that the manner in which the lineup was shown, as well as its construction, call the reliability of the identifications into substantial doubt. (Doc. 25 p. 9).  Specifically, in regards to the construction of the lineups, Defendant argues that the lineup is unduly suggestive in that Defendant is the only person with his specific hairstyle, that Defendant's picture is at a closer angle than at least four of the other five

---

[5]  Although Defendant does not so state, the Court interprets Defendants argument to apply only to the second lineup created by Detective King and shown to Mr. Amorosi and Mr. Paselk on January 12,2013, and February 15, 2013, respectively.

photographs, that the number corresponding to Defendant's photograph has nine digits instead of six digits like all the other photographs, and that Mr. Paselk was not shown the most recent arrest photograph of Defendant. Additionally, Defendant argues that the showing of the lineup was unduly suggestive in that Detective Gomez interjected himself in such a manner during the lineup showings to both Mr. Amorosi and Mr. Paselk so as to steer them into selecting Defendant out of the lineup. (Tr. 110, 111). The Government argues that the lineups were not unduly suggestive and that, under the totality of the circumstances, the witnesses' identifications were reliable. (Tr. 102).

The Eleventh Circuit employs a two-step analysis in assessing the constitutionality of a trial court's decision to admit an out-of-court identification. *U.S. v. Diaz,* 248 F.3d 1065, 1102 (11th Cir. 2001). First, the court must determine whether the identification procedure was "unduly suggestive." *Id.* In considering whether a photographic array is unduly suggestive, courts analyze such factors as the size of the array, the manner of its presentation by law enforcement officers, and the details of the photographs within the array. *See U.S. v. Hutchinson,* 2013 WL 3938541, at *18 (N.D. Ga. July 30, 2013). "A lineup is not unduly suggestive merely because the defendant's photograph can be distinguished from others." *U.S. v. Smith*, 148 F. App'x 867, 874 (11th Cir. 2005) (per curiam) (unpublished) (citing *Cikora,* 840 F.2d. at 895-96). If the subjects in a lineup have substantial similarity in facial features, complexion, facial hair, and general body type and appearance, the lineup is not unduly suggestive. *See id. at* 874-75.

If a court determines that the identification procedure was unduly suggestive, then the court must consider whether, under the totality of the circumstances, the identification was nonetheless reliable. *Id.*(citing *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401

(1972), and *Dobbs v. Kemp,* 790 F.2d 1499, 1506 (11th Cir. 1986).   In determining the reliability of the identification, the court will consider the following factors: (1) the witnesses opportunity to view the suspect at the time of the crime, (2) the witnesses' degree of attention, (3) the accuracy of witnesses prior description of the suspect, (4) the level of certainty of the identification, and (5) the time between the crime and the identification. *Neil,* 409 U.S. at 199; *Cikora v. Dugger,* 840 F.2d 893, 895 (11th Cir. 1988).

### A.  Whether the Second Lineup was Unduly Suggestive

In this case, the Court finds that the second lineup, as constructed, is not unduly suggestive.  The second lineup shown to Mr. Amorosi and Mr. Paselk consisted of six mug shot photographs of African-American males of a similar age, appearance, and build.   The photographs are in black and white and the individuals all have similar complexions.  There is only a negligible variation in the closeness of the individuals' faces and the individuals' photographs are cropped so that their clothing is not seen.  Although the number corresponding to Defendant's photograph contains more digits than the numbers corresponding to the other individuals' photographs, this difference does not rise to the degree of suggestiveness the Eleventh Circuit has found to be undue. *See, e.g., Marsden v. Moore,* 847 F.2d 1536, 1545 (11th Cir. 1988) (identification procedure unduly suggestive where Defendant was the only male in the photographs shown to the witness); *O'Brien v. Wainwright,* 738 F.2d 1139, 1140-41 (11th Cir. 1984) (identification procedure unduly suggestive where Defendant's photograph was in color and all other suspects photographs were black and white).

Additionally, although the Defendant's hairstyle in the second lineup was distinctive, the Court does not find that the hairstyle was so unique as to make the lineup unduly suggestive.  According to the testimony of Detective Gomez and Detective King, Mr. Amorosi

and Mr. Paselk described the suspect as having spiked hair that stuck up in points. (Tr. 18, 90). At least two other individuals in the second lineup, the individual in photograph number 1 and the individual in photograph number 2, have hairstyles that could reasonably be described as having spikes or "hair stuck up in points." *See* Exhibits 3 and 4.  Defendant fails to cite any case law showing that a lineup must only contain photographs of individuals with identical hairstyles. To the contrary, Eleventh Circuit case law shows that there is no such requirement. *See, e.g., U.S. v. Anderson,* 156 U.S. Fed.App'x. 218 (11th Cir. 2005) (holding that a lineup with individuals with different ages and hairstyles than the Defendant was not unduly suggestive).

Detective King's decision to show Mr. Paselk the same lineup she showed Mr. Amorosi, without updating Defendant's photograph with his most recent arrest mug shot or changing his position in the lineup, was not unduly suggestive.  Although Detective King did not follow Fort Myers Police Department General Order 20.5's policy to place suspects' photographs in different positions when showing lineups to multiple witnesses, Defendant failed to elicit any testimony or evidence showing that Detective King's failure to do so was unduly suggestive.  Likewise, Defendant failed to present any evidence that Detective King's decision not to create a new lineup with Defendant's most recent mug shot photograph made the second lineup unduly suggestive when shown to Mr. Paselk.

Additionally, the Court finds that the manner in which the lineups were shown to the witnesses was not unduly suggestive.  First, as Defendant's counsel acknowledged at the hearing, Detective King's and Detective Gomez's decision not to do a sequential lineup does not, in and of itself, merit suppression. (Tr. 112-113).  The Court has reviewed the materials submitted by Defendant as Exhibit G, particularly the article "Eyewitness Accuracy Rates in

Sequential and Simultaneous Lineup Presentations: A Meta-Analytic Comparison," and notes that while there is evidence that sequential lineups may be more reliable than simultaneous lineups under certain circumstances, there is nothing in the study showing that the use of a simultaneous lineup is unduly suggestive. *See, generally,* Nancy Steblay et al., *Eyewitness Accuracy Rates in Sequential and Simultaneous Lineup Presentations: A Meta-Analytic Comparison,* 25 Law & Hum. Behav. 459 (2001).  Defendant argues that Mr. Paselk identified Defendant through a process of elimination and, as a result, a sequential lineup would have been more reliable in this case. (Tr. 112-113).  Although it may be relevant in determining whether Mr. Paselk's identification was reliable under the *Neil* factors, as will be discussed below, the manner in which Mr. Paselk selected Defendant out of the lineup is irrelevant as to whether the manner in which the detectives presented the lineup was unduly suggestive. Defendant fails to cite any case law showing that a simultaneous lineup is unduly suggestive, even if a witness uses a process of elimination to make his selection.  Accordingly, the Court will not find the lineups shown to Mr. Amorosi and Mr. Paselk unduly suggestive because they displayed all six suspects photographs simultaneously.

Furthermore, the Court finds that Detective Gomez's comments during the lineup showings did not make the lineups unduly suggestive.  Defendant argues that Detective Gomez's comments while Mr. Amorosi analyzed the lineup "steered" Mr. Amorosi away from selecting an individual other than Defendant. (Tr. 110).  Likewise, Defendant argues that Detective Gomez's comment during the showing of the lineup to Mr. Paselk encouraged him to select Defendant and were, thus, unduly suggestive. (Tr. 112).  As neither witness testified at the hearing, the Court can only rely upon the speculative testimony of Detective King and Detective Gomez and its own review of the lineup showings, audio tape recordings, and

transcripts.   Upon careful review of this evidence, particularly the audio recordings of the lineup showings, the Court finds that Detective Gomez's comments, although not the paradigm of how a lineup should be administered, were not intended to unduly influence the witness, and further, that there is insufficient evidence to find that his comments were influential to such a degree as to unduly influence the witnesses' identifications.

For the above reasons, the Court finds that the lineups shown to Mr. Amorosi and Mr. Paselk on January 12, 2013, and February 15, 2013, respectively, were not unduly suggestive in their construction or in the manner in which they were shown to the witnesses.

**B.   Whether the Witnesses' Identifications Were Reliable**

Assuming the lineups were unduly suggestive, the Court finds that, under the totality of the circumstances, the identification procedures were nonetheless reliable.   Again, as the witnesses who made the identification did not testify at trial, the Court must largely rely on Detective Gomez's and Detective King's testimony in its application of the *Neil* factors. Although their testimony chiefly consists of hearsay, the Court may nevertheless rely on it in considering Defendant's Motion to Suppress. *See U.S. v. Raddatz,* 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial.") (citations omitted).

The testimony of Detective Gomez and Detective King shows that Mr. Amorosi and Mr. Paselk had ample opportunity to view the suspect at the time of the crime.   According to Detective Gomez, Mr. Amorosi was in an office with the suspect for upwards of three minutes before the robbery occurred. (Tr. 9).   Also, Detective King testified that Mr. Paselk got a good look at the suspect because he had a face-to-face conversation with the suspect just moments before the crime was committed. (Tr. 34-35).   Further, the detectives' testimony shows that Mr.

Amorosi and Mr. Paselk had a high degree of attention as both directly interacted with the suspect moments before the crime.

Defendant argues that the identifications were unreliable because the witnesses' descriptions of the suspect do not conform to the images taken from the video surveillance camera or to Defendant himself.   Specifically, Defendant refers to Mr. Paselk's description that the suspect was wearing a black t-shirt with a logo and weighed approximately 200 to 210 pounds. (Tr. 104).  Although Defendant argues correctly that Mr. Paselk erroneously described the suspect's clothing, the Court finds that Mr. Paselk's description is consistent with Mr. Amorosi's description and otherwise accurate.   The witnesses described the suspect as an African-American male between five feet six inches tall and five feet eleven inches tall, with chubby cheeks, stocky build, full lips, and a hairstyle where the hair stood up in spikes.   Upon review of Defendant's mug shot in the lineup shown to the witnesses, the video surveillance still image, and Defendant's appearance in Court on the day of the hearing, the Court finds that the witnesses' descriptions of the suspect were generally accurate with respect to the video surveillance image and Defendant.

Defendant contends that the witnesses made their identifications with less than certainty and, as such, their identifications were unreliable. (Tr. 110-112).   Defendant's argument is unsupported by the evidence.   The Court does not find, as Defendant suggests, that Mr. Amorosi's joke at the end of his interview and Mr. Paselk's statements during his interview show that their identifications were made with less than certainty.   Based on the detectives' hearsay evidence and a review of the audio recordings of the witnesses' lineup showings, the

Court finds that the witnesses made their identifications with a level of certainty such that the identifications were reliable.[6]

Accordingly, as the Court finds that the second lineup shown to Mr. Amorosi and Mr. Paselk was not unduly suggestive and that the witnesses' identifications were reliable, it is respectfully recommended that Defendant's Motion to Suppress be **DENIED**.

Failure to file written objections to the proposed findings and recommendation contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended in Chambers in Fort Myers, Florida on September 5, 2013.**

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

---

[6] Defendant, of course, will have the opportunity at trial to directly cross-exam Mr. Amorosi and Mr. Paselk regarding the reliability of their respective identifications.